## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

CALYPSO WIRELESS, INC.,
DRAGO DAIC, & JIMMY WILLIAMSON,
P.C.,

          Plaintiffs-Counterclaim
          Defendants,

   v.

T-MOBILE USA, INC.,

          Defendant-Counterclaim
          Plaintiff.

Case No. 2:08-CV-441-JRG-RSP

Jury Trial Demanded

## DEFENDANT T-MOBILE USA, INC.'S RESPONSIVE
## CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ....................................................................................................2

ARGUMENT .........................................................................................................4

    1.    "Pre-Establish[ed] Vicinity Range," "Preestablished Vicinity Range" (All Asserted Claims) ............................5

    2.    "Communicative Recognition Between Said Computer and Said Wireless Communication Device Within Said Pre-established Vicinity Range" (Claims 4-5)..............................12

    3.    "Auto-Switching Capability," "Auto-Switching Switching Capability" (Claims 1-9, 16-30) ...................................13

    4.    "Automatically" (Claims 4, 11, 19-22)........................................16

    5.    "Dependent on the Establishment of Said [P]redetermined Parameters" (Claims 1-5, 6-9, 16-23, 24-25, 27) ........................................................................17

    6.    "Scanner Capability" (Claims 7-9), "Scanning Capability" (Claims 24-25), "Conducting a Scan" (Claim 14) ..........................................................................20

    7.    "Continuous Searching" (Claims 8, 24-25) .................................22

    8.    "Wireless Communication Device Comprising a Pager Assembly" (Claims 16-23), "Alphanumeric Pager" (Claim 23) ..........................................................................24

    9.    "Messaging Communication" (Claims 6-9, 11-15) ....................26

    10.    "Over-The-Air Network" (All Asserted Claims).........................28

    11.    "Unique Identifier" (Claims 1, 6-9, 16-23, 24-25, 27) .................29

CONCLUSION.....................................................................................................30

i

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Ameranth, Inc. v. Par Tech. Corp.*,
No. 2:10-CV-294-JRG-RSP (E.D. Tex. Aug. 10, 2012) ............................................ 20

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324 (Fed. Cir. 2006) ................................................................................. 27

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
616 F.3d 1249 (Fed. Cir. 2010) ................................................................................. 28

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed. Cir. 2004) ..................................................................................... 4

*Charles E. Hill & Assocs., Inc. v. Abt. Elecs., Inc.*,
2:09-CV-313-JRG, 2012 WL 72714 (E.D. Tex. Jan. 10, 2012) ................................. 13

*Comark Commc'ns, Inc. v. Harris Corp.*,
156 F. 3d 1182 (Fed. Cir. 1998) ............................................................................... 26

*Every Penny Counts, Inc. v. Bank of Am. Corp.*,
2:07-CV-42-FTM-29SPC, 2008 WL 4491113 ......................................................... 19

*Flash Seats, LLC v. Paciolon, Inc.*,
07-575-JJF, 2010 WL 184080 (D. Del. Jan. 19, 2010); *aff'd*, 469 F.
App'x 916 (Fed. Cir. 2012) ...................................................................................... 19

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
285 F.3d 1353 (Fed. Cir. 2002) ................................................................................. 20

*Mangosoft, Inc. v. Oracle Corp.*,
525 F.3d 1327 (Fed. Cir. 2008) ................................................................................. 10

*Markem-Imaje Corp. v. Zipher Ltd.*,
657 F.3d 1293 (Fed. Cir. 2011) ................................................................................. 20

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995); *aff'd*, 517 U.S. 370 (1996) ......................................... 8

*Microsoft Corp. v. Multi-Tech Sys.*,
357 F.3d 1340 (Fed. Cir. 2004) ......................................................................... 4, 9, 10

*Minton v. Nat'l Assoc. of Sec. Dealers, Inc.*,
197 F. Supp. 2d 699 (E.D. Tex. 2001) ...................................................................... 20

*MOEAC, Inc. v. Pandora Media, Inc.*,
   07-CV-654-BBC, 2008 WL 4500704.......................................................................... 20

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ............................................................................ 5, 30

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ....................................................................... 4, 16, 17

*Ricoh Co. v. Quanta Computer, Inc.*,
   571 F. Supp. 2d 929 (W.D. Wis. 2007) ...................................................................... 16

*Superguide Corp. v. DirecTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) ................................................................................... 17

*Symantec Corp. v. Computer Assocs. Int'l*,
   522 F.3d 1279 (Fed. Cir. 2008) ................................................................................. 26

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
   392 F.3d 1325 (Fed. Cir. 2004) ................................................................................. 19

*Virnetx, Inc. v. Microsoft Corp.*,
   No. 07-80, 2009 WL 2370727 (E.D. Tex. July 30, 2009) ........................................... 17

## Other Authorities

Tanenbaum, *Computer Networks* (Prentice Hall 1996).................................................. 27

IBM DICT. OF COMPUTER (Donnelly 1994) ................................................................... 17

THE NEW SHORTER OXFORD DICT. (Oxford 1993) ......................................................... 17

Walke, *Mobile Radio Networks: Networking and Protocols* (Wiley 1999) .................... 27

WEBSTER'S NEW UNIVERSAL UNABRIDGED DICT. (Barnes & Noble 1996) .................... 17

## PRELIMINARY STATEMENT

T-Mobile's proposed constructions for the asserted patent in this case are consistent with and required by the claims, specification, and prosecution history of the patent.  Accordingly, the Court should adopt those constructions over the proposed constructions of Plaintiffs Calypso Wireless, Inc., Drago Daic, and Jimmy Williamson, P.C., which are fundamentally at odds with the intrinsic record and seek to turn the patent into something is not.  Indeed, Plaintiffs provide scant support for their proposed constructions other than the conclusions of an expert witness retained solely for the purpose of this litigation, whose testimony has little evidentiary or informative value for claim construction.  It is not the role of an expert to tell the Court how to construe the claims.  Rather, claim construction is a matter of law, and it is the role of the Court to construe the claims to ensure that such questions are not left to the jury.

Construction of the terms addressed here is necessary to resolve disputes between the parties about the meaning and scope of the asserted claims, and to assist the jury in understanding the claims.  The technology at issue in this case is not well-known to most people and will require some explanation.  T-Mobile's proposed constructions provide simple definitions of the claim terms that are consistent with the meaning given to those elements of the claimed invention in the specification, and are legally required by the context of the claims. Plaintiffs, in contrast, assert that 12 out of 16 terms do not require construction at all, even though they are technical terms or ordinary words employed in a particular, technical way, with which the average juror is unlikely to be familiar.  When Plaintiffs have proposed a construction, those constructions are fundamentally flawed because they ignore the clear teachings in the specification, the surrounding claim language, and the disclaimers made during prosecution.  For these reasons, T-Mobile respectfully requests that the disputed claim terms be construed as a matter of law in the manner proposed by T-Mobile.

**BACKGROUND**

The '923 patent is entitled "Communication System and Method" and describes a system and method for seamless and automatic handoff of cellular calls and data transmissions between an "over-the-air" (*e.g.*, cellular or paging) network and a "short range," "computerized network" (*e.g.*, Wi-Fi, or Bluetooth). *See* D.I. 201-1 ('923 patent, Abstract); Plaintiffs' Opening Claim Construction Brief ("D.I. 201") at 3.

Figure 1 of the patent, reproduced below, depicts the claimed system. As depicted, when the wireless communication device (10) is inside a specific distance (24) from the computer (20), the communication switches automatically to a computerized network (here, a Wi-Fi network described as a "Piconet") via a computer (15, 16). *Id.* at 42-46. When the wireless communication device (10) is outside of this defined range (24), the device connects to the over-the-air network (here, a Paging or Cellular network) (14, 18).



FIG. 1

2

Taking a cellular and Wi-Fi network as examples, the fundamental concept behind the patent is the ability to carry and switch communications between a cellular network and a Wi-Fi based on the distance between the wireless communication device and the access point for the Wi-Fi network ("computer facility" or "Internet access facility" in the patent). *See, e.g.*, '923 patent at 1:55-2:9. Every claim of the '923 patent requires that the decision to switch networks be based on whether "predetermined parameters" have been met. These parameters include, for every claim, that the wireless communication device be within the "pre-established vicinity range" of the Wi-Fi access point. When the wireless communication device is within that range, the communication is automatically switched to the Wi-Fi network. When it roams outside that range, the communication is automatically switched to the cellular network.

Such a system must include the capability of the wireless communication device to recognize a network, and the patent describes a "transceiver assembly" as having this capability. The transceiver assembly consists of at least one transceiver connected to the Wi-Fi access point (depicted in Fig. 1 as (19)), and a second transceiver incorporated within the wireless communication device (depicted in Fig. 1 as (21)). *Id.* at 6:24-34. When the transceiver connected to the wireless communication device is within the pre-established vicinity range of the Wi-Fi access point, the transceivers recognize each other. *Id.* at 6:34-42. The transceivers also include scanning capabilities so that they can continuously scan to establish communication. *Id.* at 7:15-23. Although Figure 1 depicts a phone as a wireless communication device, the patent discloses that a wireless communication device could be a pager or PDA. *Id.* at 4:59-61.

Calypso previously attempted to market a wireless phone embodying the purported invention of the '923 patent, but those efforts failed, and Calypso now appears to be seeking solely to license the patent.

**ARGUMENT**

The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). The specification "is the single best guide to the meaning of a disputed term." *Id.* Notably, the "specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316. Furthermore, the applicant's statements to the PTO examiner in obtaining a patent "can often inform the meaning of the claim." *Id.* at 1317. Courts should not "construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the [Patent Office]." *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004). A disclaimer made during prosecution applies regardless of whether the Patent Office relies on it. *Id.* at 1349-50. Finally, "while extrinsic evidence can shed useful light on the relevant art," it "is less significant than the intrinsic record," and "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1317, 1319 (internal quotations omitted); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004).

Plaintiffs repeatedly assert that terms do not require construction when "a person of ordinary skill in the art would readily be able to determine the plain meaning" of the term, and that evidence should not be considered if a person of ordinary skill in the art would not need to use that evidence to understand the term. *See, e.g.*, D.I. 201 at 13. That is not the relevant standard for whether the terms require construction or what evidence is relevant to the correct construction of a term. Although a court must ordinarily give terms "the meaning that the term would have to a person of ordinary skill in the art," a court construes terms so that the jury can understand their meaning. Because juries are typically not persons of ordinary skill in the art, a

court must attempt to discern the meaning of the term to a person of ordinary skill in the art—a meaning that is often "not readily apparent" to a lay judge and jury. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

As explained below, each of T-Mobile's proposed claim constructions is correct in light of the plain language of the claims, specification, and prosecution history of the '923 patent, and is consistent with how one of ordinary skill in the art would construe the terms.[1]

1.    **"Pre-Establish[ed] Vicinity Range," "Preestablished Vicinity Range" (All Asserted Claims)**

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
|---|---|
| A zone within which at least two transceivers in a transceiver assembly are able at a preset power level to recognize each other | A predetermined, fixed distance existing between the wireless communication device and the computer facility |

The central idea of the patent-in-suit is a system for switching communications between two types of networks, a wireless, over-the-air network, such as a cellular network, and a short-range network with a local access point, such as Wi-Fi network. Had the patentee based the network switching decision on signal strength and quality, the patent would not have been granted, in view of the prior art (*see* Section 1.b below). Instead, the patentee based the switching decision on the presence of the wireless communication device within a fixed distance of the Wi-Fi access point ("computer facility" in the patent). This distance is the "pre-established vicinity range," a limitation that was incorporated into every claim in the patent-in-suit to overcome the PTO examiner's prior art rejection. Plaintiffs' proposed construction takes the words "pre-established" and "vicinity" out of the phrase "pre-established vicinity range" altogether, converting it into an amorphous "zone" whose boundaries would fluctuate depending

---

[1] The parties stipulated to constructions of several terms in a joint filing on September 9, 2010. D.I. 167 at Attachment 1. In addition, while the parties' were previously unable to reach agreement regarding two limitations, T-Mobile believes, after reviewing Plaintiffs' brief, that there is no real dispute as to "a computer configured for computerized network access" or "Internet Access Facility," and therefore agrees that those terms do not require construction.

on environmental and physical factors that affect the distance a signal can travel even at a "preset power level."  Plaintiffs' proposed construction also effectively changes the limitation from one based on distance to one based on signal strength, by providing that the "pre-established vicinity range" is simply however far the signal can reach in a given moment at a "present power level." This Court should reject this construction, which contradicts the specification and constitutes a blatant attempt to reclaim scope disclaimed during prosecution.  In contrast, T-Mobile's proposed construction clarifies the meaning of this limitation in accordance with the intrinsic evidence by specifying that the vicinity is the distance between the Wi-Fi access point and the wireless communication device, the threshold level for which must be predetermined.

### a.   The Claims and Specification Clearly Describe the "Pre-Established Vicinity Range" as a Fixed Physical Distance

The plain language of the term provides that the "vicinity range" is "pre-established"— indicating that it is a predetermined constant in the decision whether to invoke the auto-switching capability.  Both the claims and the specification require that the "pre-established vicinity range" be a fixed maximum distance from the computer facility to the phone.  The specification provides that in order for switching to occur, "the maximum *distance* between the wireless communication device and the computer must be within the pre-established vicinity range." '923 patent at 6:63-67 (references to figures omitted).  The specification always describes the "pre-established vicinity range" as a specific distance, generally about 100 meters.  *See, e.g.*, 3:8-11; 3:62-64; 5:36-38; 6:52-53.  This contradicts Plaintiffs' proposal of a "zone" dependent on "preset power levels," which would dynamically change based on interference from various environmental factors, such as walls, signal interference and weather, and could not be a pre-established distance, as Plaintiffs' expert concedes.  Declaration of Dr. Ahmed Tewfik in Support of Plaintiffs' Opening Claim Construction Brief ("Tewfik Decl.") ¶ 15.

Plaintiffs set up a straw man by arguing that the patent discloses that the distance for the

"pre-established vicinity range" "can vary." D.I. 201 at 17. The dispute between the parties is whether the distance is fixed for each system as implemented, ***not*** whether the patent discloses a single distance for all purposes (100 meters). T-Mobile does not propose construing "pre-established vicinity range" as limited to only 100 meters—that is clearly just one preferred embodiment, as claimed in claim 26. Indeed, the specification provides that the distance "can vary greatly based at least in part on technological advancements," but is always "*pre-established* and determined based on current technological standards." '923 patent at 3:11-21.

Plaintiffs also set up a false dichotomy between a "predetermined, fixed distance" and a "coverage area" or "zone"—describing this as a "key issue" in their brief. D.I. 201 at 17. This mischaracterization should be rejected out of hand. T-Mobile's proposed construction plainly addresses the maximum distance for the "pre-established vicinity range," and does not require that the wireless communication device and the computer be exactly a predetermined distance apart. In other words, there is nothing wrong with describing the "vicinity range" as a "zone," but it must be a zone that is defined by a preset, maximum distance between the wireless device and the computer, and not some vague, unspecified value.

The specification and claims also repeatedly refer to the wireless communication device being "inside" or "outside" the pre-established vicinity range. For example, claim 11 provides that the communication will be "automatically switch[ed]" between the Internet and the over-the-air network dependent at least on said wireless communication device being inside or outside a "pre-established vicinity range relative to the Internet access facility." *See also* Claim 6 ("said predetermine parameters comprising . . . a pre-established vicinity range existing between any one of said wireless communication devices and any one of said plurality of Internet access devices."). "[P]reestablished vicinity range" must refer to a fixed distance for this claim language to make sense. A system based on signal strength would not use as a parameter

whether a device is inside or outside a "pre-established vicinity range"—rather it would reference whether the device was receiving or not receiving a signal of some threshold strength—and that threshold may be met at a variety of distances from the access point depending on environmental factors.  The '923 patent never makes any such reference.

> **b.**    **The Prosecution History Requires "Pre-established Vicinity Range" to Refer to a Fixed Distance**

T-Mobile's proposed construction is also mandated by the prosecution history.  The patentee distinguished the claims over the prior art during prosecution of the '923 and related patents on the basis that the "pre-established vicinity range" limitation was not found in the prior art.  D.I. 201 at 18.  This "'undisputed public record' of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995); *aff'd*, 517 U.S. 370 (1996).

Specifically, during prosecution of the '923 patent, the examiner initially rejected all claims that did not include the "pre-established vicinity range" limitation, finding that they were anticipated or rendered obvious by two prior art references, Forslow and Kolls.  Exh. 1 at CALYPSO00071-73; Exh. 2 (U.S. Patent No. 6,608,832); Exh. 3 (U.S. Patent No. 6,601,040).  The examiner found that Forslow encompassed every limitation of the claims except "pre-established vicinity range," and suggested that the patentee add this limitation to every independent claim to put the claims into condition for allowance.  Exh. 1 at CALYPSO00073, 0081, 0092, 0121.  The patentee did so, and the PTO subsequently allowed the claims, observing:  "the predetermined parameters comprises acceptance of the unique identifiers and a pre-established vicinity range existing between anyone of the wireless communication devices and anyone of the plurality of Internet access devices."  *Id*. at CALYPSO000123-124.  The prior

art cited during prosecution disclosed auto-switching based on signal strength and quality.[2] Thus, the prosecution history makes it clear that "pre-established vicinity range" cannot be synonymous with, or a proxy for, signal strength.  Rather, it is physical distance, which was what allowed the patentee to overcome the prior art rejections.

The patentee also disavowed Plaintiffs' current interpretation of "pre-established vicinity range" during prosecution of application 11/040,842,[3] which is a continuation-in-part of the application that led to the '923 patent.[4]  The examiner of that application had rejected various claims in light of Aho, U.S. Patent No. 6,198,941 (Exh. 5), which discloses a device with a GPS function that switches networks based on the location of the wireless communication device, and other references, as anticipating the "pre-established vicinity range" limitation.  *See* Exh. 4 at TMUS-PRIOR-ART00004759-60.  In response, the patentees argued that switching networks based on the device's GPS-determined *position* was distinct from switching based on the device's *distance from* the computer.  Exh. 4 at TMUS-PRIOR-ART00004791 (explaining that "the ability of the Aho et al. device to have GPS capabilities does not render obvious Applicant's claimed auto switching capabilities being dependent on a predetermined parameter which is now more specifically defined as presences within a pre-established vicinity range").  Indeed, in that application, patentees specifically claimed signal strength and signal integrity as further

---

[2] For example, Csapo claims "a control circuit which compares a signal quality of the subscriber encoded signal with a signal quality of the remote subscriber encoded signal, and which controls said selector circuit . . . when the signal quality of the remote subscriber encoded signal is within predetermined acceptance parameters," Exh. 6 (U.S. Patent No. 5,910,946) at claim 10, and Saario discloses allocating communication channels based on preset power levels and signal interference, Exh. 7 (U.S. Patent No. 6,272,348) at 8:1-17.  *See* Ex. 1 at CALYPSO00073.

[3] Application 11/040,842 ultimately issued as U.S. Pat. No. 7,546,141.

[4] Because a continuation-in-part claims priority to the earlier application and is based on the same invention disclosed in the parent application, statements made during prosecution are highly relevant to construing terms in the parent's claims.  *Microsoft v. Multi-Tech*, 357 F.3d at 1349.  Although a modest amount of new material was added to the continuation-in-part, none of it relates to the "pre-established vicinity range" limitation.

predetermined parameters in dependent claims, demonstrating their knowledge that they were distinct from "pre-established vicinity range."  Exh. 4 at TMUS-PRIOR-ART00004444, 4789. Patentees overcame rejection by amending the claims to require that the "pre-established vicinity range" be a required predetermined parameter.  *Id.* at TMUS-PRIOR-ART00004787-95 (noting that the parameters include "predetermined vicinity range relative to the network access, signal strength and signal integrity").  As the Federal Circuit has noted, statements made during prosecution of a related application are treated in claim construction as if they were made during prosecution of the patent at issue.  *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004).  Therefore, patentees clearly disclaimed Plaintiffs' current proposed construction and employed T-Mobile's proposed construction.  *See, e.g.*, *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1333 (Fed. Cir. 2008).

### c.    Plaintiff's Construction Contradicts the Specification and the File History

Plaintiffs' proposed construction, "A zone within which at least two transceivers in a transceiver assembly are able at a preset power level to recognize each other," not only has no support in the specification but it is fundamentally at odds with the entire concept of the invention, which Plaintiffs themselves describe as allowing for "automatic operation and seamless transition of data communication, *i.e.* 'hand-off', to and from a wireless communication device over a short range communication network and/or an over-the-air network."  D.I. 201 at 3.  The plain language of the term requires a "pre-established vicinity range," not an indeterminate "zone" whose boundaries Plaintiffs' own expert concedes will depend on "interference and background noise."  Tewfik Decl. ¶ 15.  A range that depends on the power level of the transmitter and environmental factors cannot be "predetermined" or consist of a specific "vicinity range," but must necessarily fluctuate over time.  Indeed, the relevant metric in such a system would not be distance at all, but the signal strength detected by the transceiver—a

concept never disclosed in the '923 patent.

As explained above, Plaintiffs' proposed construction contradicts the disclosures in the specification and file history: the word "zone" and the phrase "preset power levels" do not appear in the specification, which instead consistently focuses on the physical distance between the wireless communication device and the computer.  The use of "preset" power levels will not make the "zone" of Plaintiffs' proposed construction "pre-established" because, even using a constant power level, the range of the signal will fluctuate based on interference, environmental factors, and physical setting, as conceded by Plaintiffs' expert.  Tewfik Decl. ¶ 15.  Indeed, the concept of a physical boundary would have no meaning in a system relying on signal strength, as the ability of the transceivers to "recognize each other" (Plaintiffs' construction) at given distances would vary based on factors other than distance from the transmitter.  As noted above, the '923 patent makes no mention of signal strength, which was specifically disallowed by the examiner during prosecution as within the scope of the prior art.

Not surprisingly, Plaintiffs' only support for their construction is the conclusory statements of their expert, untethered to the specification or file history.  D.I. 201 at 18.  Plaintiffs' expert describes a system that routes communication based on "signal to noise ratio," which may be affected by "interference and background noise."  Tewfik Decl. ¶ 15.  This is not the system disclosed in the patent and is directly at odds with the prosecution history of the patent-in-suit or related patents, which distinguished "pre-established vicinity range" from signal strength.  Therefore, this testimony should be disregarded as unhelpful to the proper construction of this term.  *Phillips*, 415 F.3d at 1318 (discounting "any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history") (internal quotations omitted).

2.   **"Communicative Recognition Between Said Computer and Said Wireless Communication Device Within Said Pre-established Vicinity Range" (Claims 4-5)**

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
|---|---|
| No construction necessary; alternatively, establishment of a communication link between the computer and the wireless communication device | Recognition by the first transceiver of the second transceiver associated with the wireless communication device when the wireless communication device is within the pre-established vicinity range of the computer [5] |

Plaintiffs propose a construction that would significantly broaden the scope of claim 4 and the claims that depend from it by removing two critical limitations: (1) that the wireless device be within the pre-established vicinity range to recognize the computer (and the computerized network), reading the language "within said pre-established vicinity range" out of the limitation altogether, and (2) that the computer and the wireless device recognize each other in order to communicate, *i.e.*, "communicative recognition." Both are required by the plain claim language as well as other disclosures in the specification.

This limitation appears only in dependent claim 4 of the '923 patent, which recites: "[a] system . . . wherein said transceiver assembly automatically establishes *communicative recognition between said computer and said wireless communication device within said pre-established vicinity range*." '923 patent at 9:35-38. The plain language of the claim requires (1) *recognition* as well as communication, and (2) that the transceivers recognize each other *only* when the wireless communication device is *within the pre-established vicinity range*.[6] Yet

---

[5] T-Mobile has adjusted its construction of this term to reduce the issues in dispute. While T-Mobile's prior construction required "mutual authentication" of the transceivers, this term appears to require only that the "first transceiver" associated with the computer facility recognize the "second transceiver" associated with the wireless communication device.

[6] The parties do not dispute which elements of the system establish the communicative recognition. The transceiver assembly consists of the first and second transceivers, the first transceiver being connected to the Internet access facility or computer, and the second connected to the wireless communication device. *See* '923 patent at 6:24-34. Thus it is essentially the

[Footnote continued on next page]

Plaintiffs' construction expresses neither requirement.  As noted above (*see* Section 1.b), the PTO only allowed the claims of the '923 patent after "pre-established vicinity range" was added to every independent claim; Plaintiffs cannot now excise that limitation in claim construction.

The specification similarly requires the transceiver assembly to establish the "communicative *recognition*," and not simply "communication," as proposed by Plaintiffs.  *See, e.g.*, '923 patent at 6:34-47 ("Each of the wireless communication devices 10 may also include a unique identifier or 'code' to facilitate *recognition* between the first and second transceiver chips 19 and 21."); *see also, e.g.*, 2:48-57; 7:24-29.  Plaintiffs are unable to point to anything in the specification that supports their contention that "communication recognition" does not, in fact, require recognition.[7]  Nor do they provide justification for the elimination of the "pre-established vicinity range" limitation.

### 3.   "Auto-Switching Capability," "Auto-Switching Switching Capability"[8] (Claims 1-9, 16-30)

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
| --- | --- |
| The ability to determine whether data communication with the wireless communication device occurs over the computerized network or by the over-the-air network | Capability to determine and automatically switch[9] |

[Footnote continued from previous page]
same to say that either the first and second transceivers or the computer and wireless communication device "recognize" each other.  T-Mobile's proposed construction is more precise, because it is the first and second transceivers *within* the computer and wireless communication device that perform this function.

[7] Plaintiffs irrelevantly argue that plain meaning is appropriate here because "[a] person of ordinary skill" would purportedly understand this phrase without construction.  D.I. 201 at 19.  Claim construction is not intended to clarify the meaning of the claims to one of ordinary skill, but for the jury, the court, and the parties.  *See Charles E. Hill & Assocs., Inc. v. Abt. Elecs., Inc.*, 2:09-CV-313-JRG, 2012 WL 72714, at *7, 12, 14-15 (E.D. Tex. Jan. 10, 2012).

[8] The term "auto-switching switching capability" appears only in claim 6 and may have been a typographical error.

[9] In order to reduce the issues for the Court to resolve, T-Mobile has revised its construction to incorporate the functionality described in Plaintiffs' proposed construction, which T-Mobile agrees is also part of the functionality provided by the "auto-switching capability" of the

[Footnote continued on next page]

Plaintiffs' proposed construction of this phrase is fundamentally flawed because it attempts to read the two key terms, "auto" and "switching," out of the phrase altogether and fails to encompass the full range of the "auto-switching capability."  Plaintiffs' construction also unnecessarily and confusingly repeats additional language from the claims in which it appears. T-Mobile's proposed construction, in contrast, succinctly captures the full meaning of this term as informed by the specification and claims.

The '923 patent claims a system that allows a wireless communication device to operate on different types of networks and to switch between them dependent on certain parameters.  *See* '923 patent at Abstract.  In all of the system claims of the patent, this functionality is described with the limitation "auto-switching capability" (or "auto-switching switching capability," which the parties agree should have the same construction).  When read in the context of the claims and specification of the '923 patent, the term refers to the capability of the transceiver assembly (1) to *determine* whether to switch between the computerized network and the over-the-air network, as well as the capability (2) to *switch automatically* between the two.  For example, the claims themselves make clear that the auto-switching capability of the transceiver assembly is capable of *both* determining which network to connect with *and* establishing that connection.  The independent claims (claims 1, 6, 16, 24, 27) describe the "auto-switching capability" as "*determinative* of data communication with said wireless communication device either over [or "by"] the computerized network . . . or by the over-the-air network," and the dependent claims (claims 19-22) recite that the auto-switching capability "*automatically switch[es]*" (or

---

[Footnote continued from previous page]
transceiver assembly.  *Cf.* D.I. 167 at Attachment 2, at 6.  T-Mobile's proposed construction still includes the more important aspect of the "auto-switching capability" functionality, which is the switching itself, specifically the establishing, providing, or transferring (collectively synonymous with "routing") of the connection itself to either the computerized network or the over-the-air network.

"*automatically establish[es]*") the data communication between the wireless communication device and one of the types of networks.

The specification similarly describes the auto-switching capability of the transceiver assembly as *establishing* communication between the wireless communication device and the over-the-air network. When the wireless communication device is beyond the pre-established vicinity range or when the other predetermined parameters for switching are not met, the specification teaches that the auto-switching capability actually *establishes* communication between the device and the over-the-air network, and does not simply *determine* the network to be used. *Compare* '923 patent at Abstract, 3:22-37, 3:44-48, 7:4-10, 8:9-22 (all describing the "auto-switching capability" as automatically establishing, providing, or transferring data communication with (or to) the computer or with (or to) the over-the-air network), *with* 1:13-19 ("auto-switching capabilities for determining the route of communication with the wireless communication device").

Plaintiffs' proposed construction improperly ignores the majority of the descriptions of the functionality of this element in favor of a single sentence in the specification.[10] Indeed, the concept of "auto" is entirely absent from Plaintiffs' proposed construction, as is the concept of "switching." Further, the second half of Plaintiffs' proposed construction—"data communication with the wireless communication device occurs over the computerized network or by the over-the-air network"—or a variation thereof, already appears in all of the claims in which "auto-switching capability" appears, making it redundant and unnecessary. '923 patent,

---

[10] The portions of the specification Plaintiffs cite actually support T-Mobile's proposed construction. D.I. 201 at 12. For example, Plaintiffs cite a passage for the proposition that the "auto-switching capabilities enable a system to select an appropriate, compatible over-the-air network," but that passage in fact explains that, due to the auto-switching capabilities, "data communication is *automatically established* with the access facility," one of the two key elements included in T-Mobile's proposed construction and missing from Plaintiffs' proposed construction. '923 patent at 3:23-25.

claim 1; *see also, e.g.*, *Ricoh Co. v. Quanta Computer, Inc.*, 571 F. Supp. 2d 929, 941 (W.D. Wis. 2007) ("There is no need to repeat [other claim language] in the construction of a particular term in the claim."). Plaintiffs provide no persuasive argument why this redundancy is necessary. Plaintiffs' expert merely repeats the arguments made by Plaintiffs in their brief and can be disregarded. Tewfik Decl. ¶ 12. *See Phillips*, 415 F.3d at 1318 ("conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court").

### 4.    "Automatically" (Claims 4, 11, 19-22)

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
|---|---|
| No construction – plain meaning | Without user input |

Although Plaintiffs propose "plain meaning" for this term, their brief makes clear that they seek to read the word "automatically" to mean *the opposite* of its plain meaning: *i.e.*, as requiring manual user input. D.I. 201 at 13-14; Tewfik Decl. ¶ 13. Plaintiffs' interpretation is fundamentally at odds with the teachings of the patent, which determines what network to use and switches communications without manual input once certain predetermined parameters including the pre-established vicinity range are met. T-Mobile's construction, on the other hand, captures how this term is used in the patent in a straightforward manner. *See, e.g.*, '923 patent at 3:24-26 ("data communication is *automatically established* with the access facility *when at least one, or both of the aforementioned predetermined parameters (vicinity range and identification) have been established*"); *see also, e.g.*, 3:44-48, 7:4-10, 7:52-57. User input is never identified as a predetermined parameter (and would contradict the notion of "predetermined").

T-Mobile's proposed construction is also consistent with technical and ordinary definitions of "automatically," and accords with how courts have construed this term in other patents. *See, e.g.*, Exh. 8 at 42 (IBM DICT. OF COMPUTER (Donnelly 1994) (defining "automatic" as "pertaining to a process or device that, under specified conditions, functions without intervention by a human operator")); Exh. 9 at 140 (WEBSTER'S NEW UNIVERSAL UNABRIDGED

DICT. (Barnes & Noble 1996) ("having the capability of starting, operating, moving, etc., independently"); Exh. 10 at 152 (THE NEW SHORTER OXFORD DICT. (Oxford 1993) ("Self-acting; *esp.* (of a machine, device, etc.) working of itself, with little or no direct human actuation; (of a process etc.) working thus, involving such equipment."));[11] *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 893 (Fed. Cir. 2004) (affirming construction of "automatically electronically converting" as "a change in form of the selected television program listings by an electronic means without further involvement of the system's user"); *Virnetx, Inc. v. Microsoft Corp.*, No. 07-80, 2009 WL 2370727, at *13 (E.D. Tex. July 30, 2009) (construing "automatically initiating the VPN" as "initiating the VPN without involvement of a user").

Plaintiffs argue for "plain meaning" because the patentee has not provided "any special meaning or redefined the term," but they provide no support for their arguments that T-Mobile's construction is inconsistent with or contradicts the plain meaning of the term as understood in the context of the patent, as opposed to their own understanding of "plain meaning."  D.I. 201 at 13.

### 5.    "Dependent on the Establishment of Said [P]redetermined Parameters" (Claims 1-5, 6-9, 16-23, 24-25, 27)

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
| --- | --- |
| No construction necessary – plain meaning; Alternatively, the communication system has an auto-switching capability that allows for data communication with the wireless communication device either over the computerized network or through the computer facility when predetermined factors have been used to define the system, determine or limit its performance | Depending on whether the two or more predetermined parameters have been met |

The parties' dispute regarding this term boils down to whether the plural use of "predetermined parameter**s**" in the '923 patent requires two or more predetermined parameters.

---

[11]  Contrary to Plaintiffs' arguments, the Federal Circuit in *Phillips* recognized that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words' and have 'the value of being an unbiased source accessible to the public in advance of litigation."  *Phillips*, 415 F.3d at 1322, 1318 (internal quotations omitted).

T-Mobile contends that the specification and case law make clear that the use of plural means more than one, while Plaintiffs contend that the use of plural can include only one.[12]

The plain language of the claim term refers to "*said* predetermined parameters," meaning the multiple predetermined parameters specifically described earlier in the claim.  For example, Claim 1 provides that the "auto-switching capability [is] responsive to pre-determined parameter**s**," and that "at least one of said predetermined parameter**s** compris[es] a pre-established vicinity range," meaning that there is at least one parameter other than the "pre-established vicinity range" to which auto-switching is responsive.  These additional parameters are identified in other claims, such as claims 5 and 6, which identify the recognition of the unique identifier as another parameter, and even where not specifically identified, they are described in the specification.

Plaintiffs' own citations to the claims and specification support T-Mobile's proposed construction.  First, Plaintiffs note that the claims often specify that "*at least one* of said predetermined *parameters* compris[es] a pre-established vicinity range."  *See* D.I. 201 at 16 (citing '923 patent, claims 1, 16, 24, and 27).  This language describes that the pre-established vicinity range is *one* of *multiple* predetermined parameters, and does not demonstrate that pre-established vicinity range is the *only* predetermined parameter.  Second, when the specification describes reliance on "at least one parameter," singular, it uses the singular "parameter."  *See, e.g.*, '923 patent at 3:3-19.  In other instances, the specification describes the use of more than

---

[12] Plaintiffs' proposed construction further confuses rather than clarifies by including limitations redundant with the surrounding language of the claims ("auto-switching capability . . . when") and adding terms and concepts not present in the patent (". . . used to define the system, determine or limit its performance").

one predetermined parameter with the word "parameter**s**." *See, e.g.*, *id.* at 1:16-18; 7:29-32.[13]

Thus, the patentee clearly knew how to distinguish between singular and plural, and the system, as claimed, relies on multiple parameter**s**.  Third, Plaintiffs assert that the recitation of two predetermined parameters in claim 6 supports the notion that the term "encompass[es] the singular."  D.I. 201 at 16.  If anything, this language supports the opposite conclusion.  Claim 6 specifically recites the use of *two* predetermined parameters: (1) acceptance of said unique identifiers and (2) a pre-established vicinity range.

Both the Federal Circuit and courts in this District have interpreted the use of a plural term as requiring "two or more" when clear from the context of the patent that more than just one was required.  *See, e.g.*, *Markem-Imaje Corp. v. Zipher Ltd.*, 657 F.3d 1293, 1297 (Fed. Cir. 2011); *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1357 (Fed. Cir. 2002); *see also, e.g.*, *Minton v. Nat'l Assoc. of Sec. Dealers, Inc.*, 197 F. Supp. 2d 699, 705 (E.D. Tex. 2001) (holding that "[w]hen the plural form of a noun is used in a claim, the proper interpretation is 'two or more.'"); *Ameranth, Inc. v. Par Tech. Corp.*, No. 2:10-CV-294-JRG-RSP, slip op. at 7-8 (E.D. Tex. Aug. 10, 2012).

Plaintiffs' own citations to case law fail to support their proposed construction.  Plaintiffs quote a Federal Circuit opinion out of context to support the general proposition that "the plural can describe a universe ranging from one to some higher number," but, in fact, the Federal Circuit characterized this as *an exception* to the rule due to the particular context of that case.

---

[13] The internal grammar of the '923 patent consistently supports T-Mobile's reading that the auto-switching will not occur if any of the *plural* predetermined parameters *are* not met.  For example, the specification describes that "the auto-switching capabilities of the present invention establishes data communication by means of a compatible over-the-air network . . . when *either or both of the predetermined parameters* between a given access facility and a corresponding wireless communication device *are* not met." '923 patent at 3:31-38; *see also id.* at 7:52-55 ("If the aforementioned pre-determine *parameters* of identification and vicinity range *are* not met the auto-switching capabilities of the present invention are automatically operative to find an appropriate, compatible over-the-air network").

*Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) ("*in context*, the plural *can* describe a universe ranging from one to some higher number, rather than requiring more than one item").  The courts in each of the cases cited by Plaintiffs similarly found that an exception to the general rule that the use of the plural requires more than one was appropriate because of the disclosures of the patents at issue in those cases.  *See Flash Seats, LLC v. Paciolon, Inc.*, 07-575-JJF, 2010 WL 184080, at *9 (D. Del. Jan. 19, 2010); *aff'd*, 469 F. App'x 916 (Fed. Cir. 2012) (finding nothing in the specification and claims that precluded use of the invention in connection with a single seller); *Every Penny Counts, Inc. v. Bank of Am. Corp.*, 2:07-CV-42-FTM-29SPC, 2008 WL 4491113, at *6 (finding that the specification described the system working with just a single account); *MOEAC, Inc. v. Pandora Media, Inc.*, 07-CV-654-BBC, 2008 WL 4500704, at *6 (finding that requiring only the plural would be nonsensical when considered in context of the invention's purpose).  In contrast, the '923 patent makes clear that the invention requires the establishment of more than one parameter to switch networks.  This is highlighted by the use of "said," which focuses on concrete, specific parameters referenced earlier in the claim and described in the specification.

### 6.   "Scanner Capability" (Claims 7-9), "Scanning Capability" (Claims 24-25), "Conducting a Scan" (Claim 14)

| Term | Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
|---|---|---|
| Scanner / Scanning Capability | No construction necessary – plain meaning.  Alternatively:  ability to operate as a scanner to allow for recognition of or between compatible devices or components | Capability to scan to allow for mutual recognition of one of each of a plurality of first and second transceivers[14] |

---

[14] T-Mobile has revised its proposed construction to address concerns raised in Plaintiffs' brief that by identifying only a single first and second transceiver T-Mobile was limiting the scope of the claims which describe one of a plurality of first and second transceivers, which was not T-Mobile's intent.  D.I. 201 at 24.  Although T-Mobile disagrees that its original construction limited the claims in this respect, it has revised its construction to avoid confusion.

| Conducting a scan | No construction necessary – plain meaning; Alternatively, scanning to allow for recognition of or between compatible devices or components | Scanning to allow for mutual recognition of one of each of a plurality of first and second transceivers |
|---|---|---|

The parties do not disagree about the purpose of the "scanning capability" limitation (or "scanner capability," or "conducting a scan," as it is variously termed), which is to allow the computerized network access point to recognize the wireless communication device so that auto-switching may occur. The parties only disagree about whether this is a capability of the transceiver assembly or some other component of the system. The specification makes clear that the scanning capability pertains specifically to the transceiver assembly, as reflected in T-Mobile's proposed construction. Plaintiffs' proposed construction, in contrast, renders these related terms overly broad, and introduces ambiguous words like "compatible devices or components" to describe which elements of the claimed system and method engage in scanning.

The intrinsic record is clear that it is the transceiver assembly—that is, a first transceiver connected to the wireless communication device and a second transceiver connected to the computer facility—that contains the scanning capability. *See* '923 patent at 6:24-34. This is explicitly stated in claims 7 and 24 and in the specification. '923 patent at 7:17-21 (describing the scanner capabilities as "specifically incorporated within the aforementioned transceiver assembly"); 3:57-61 ("the transceiver assembly, . . . including a scanning capability wherein *scanning for recognition*, . . . is conducted"). According to claim 8, the scanning or scanner capability is "structured to provide continuous searching by at least one of said first or second plurality of transceivers for the other and establish communication there between." *See also, e.g., id.* at Claim 24; 7:17-21 (describing that the "operative features" of the scanner capabilities

include that "the first and second transceivers 19 and 21 are continuously searching.").[15]

Unequivocally, then, the claims and specification reveal that the scanning capability is a capability of the first and second transceivers, and that it is the transceivers that conduct the scan and mutually recognize each other—not some unspecified components, as Plaintiffs assert.

Plaintiffs make no arguments that their proposed construction is supported by the specification or would clarify the meaning of the claim term to the jury. Instead, Plaintiffs contend, incorrectly, that T-Mobile's proposed construction would render claims 7 and 8 equivalent, ignoring that claim 8 recites that the scanning capability performs "continuous searching," to enable the mutual recognition, a limitation entirely absent from T-Mobile's proposed construction of scanning capability. D.I. 201 at 26. The declaration of Plaintiffs' expert on the scanner terms consists entirely of conclusory statements, with no explanation whatsoever, and can be disregarded. Tewfik Decl. ¶¶ 19-21; *see Phillips*, 415 F.3d at 1318.

### 7.    "Continuous Searching" (Claims 8, 24-25)

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
|---|---|
| No construction necessary – plain meaning | Searching that is uninterrupted and without cessation |

The parties dispute the breadth of disclosure regarding ***how*** the transceivers scan to recognize each other. T-Mobile proposes that the patent discloses a system in which the transceivers search for each other in a manner that is uninterrupted and that does not end until either: (1) the transceivers have recognized each other or (2) the transceiver in the wireless device determines that it is not in range of an appropriately configured computerized network.

In each of the asserted claims in which it appears (claims 8, 24), the term "continuous

---

[15]  Scanning is also referred to within the patent as a "find-me-follow-me" procedure. '923 patent at 3:65-67. The specification clarifies that "a first and second transceiver, associated with the transceiver assembly of the present invention, provide for a 'find-me-follow-me' procedure in an attempt to recognize one another and establish messaging communication." '923 patent at 7:48-51 (references to figures omitted).

searching" is described as a property of the scanning capability, and the scanning capability continuously searches between the first and second transceivers in order to establish communication between the wireless communication device and the computerized network when the wireless device is within the pre-established vicinity range.  The specification describes the role of the continuous searching the same way.  '923 patent at 7:18-21 (describing the "[o]perative features of the scanner capabilities … provide for *preferably continuous scanning*, wherein the first and second transceivers are *continuously searching* to establish messaging communication between compatibly configured computers and wireless communication devices.") (references to figures omitted); 8:18-22 ("If the connection is lost . . . the auto-switching capability returns to the scanning capabilities . . . to continuously search for a compatible Internet access facility or computer or alternatively switches to communication with an over-the-air network.") (references to figures omitted).  The invention thus provides that the first and second transceivers will be searching for other networks continuously.[16]

Plaintiffs' argument that T-Mobile's proposed construction would read out the preferred embodiment confuses the patent's use of "scanning" and "searching."  D.I. 201 at 27-29.  The patent describes that *scanning* may occur on a "substantially continuous basis" or a "preferably continuous basis," and may be "re-activated if a connection is lost."  '923 patent at 3:56-67, 7:18-23, 8:23-42.  Once the scanning has begun, however, the patent is clear that the *searching* performed by the transceivers is continuous (uninterrupted and without cessation) until communication can be established.  *Id.* at 8:5-9, 8:18-22.  In fact, the patent's qualification of the scanning as "substantially" or "preferably" continuous supports T-Mobile's proposed

---

[16]  T-Mobile's proposed construction is consistent with contemporaneous dictionaries, which define "continuous" as "uninterrupted in time" and "without cessation."  *See, e.g.*, Exh. 9 at 440 (WEBSTER'S (giving "uninterrupted in time; without cessation" as the primary definition for "continuous")); Exh. 10 at 495 (OXFORD (defining "continuous" in relevant part as "uninterrupted in time or sequence; acting without interruption")).

construction.  If "continuous" did not mean without interruption or cessation, there would be no need to modify "continuous" when referring to the scanning.  Concomitantly, if the patentee had wanted the searching to be something other than continuous, it could have incorporated these modifiers into the claim language.

**8.     "Wireless Communication Device Comprising a Pager Assembly" (Claims 16-23), "Alphanumeric Pager" (Claim 23)**

| Terms | Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
|-------|-----------------------------------|----------------------------------|
| "Wireless Communication Device Comprising a Pager Assembly" | No construction necessary – plain meaning; alternatively, wireless communication device comprising hardware and software necessary for numeric and/or alphanumeric communication | *A pager* including hardware and software necessary to operate using standard paging protocols[17] |
| "Alphanumeric Pager" | No construction necessary – plain meaning; alternatively, hardware and software necessary for alphanumeric communication | *A pager* including hardware and software necessary to operate using standard paging protocols and capable of receiving alphanumeric messages |

The heart of this dispute is whether one type of wireless communication device, a "pager," which is limited to alphanumeric communication, is interchangeable with any wireless communication device capable of alphanumeric communication, even if that device has other capabilities that render it distinct from a pager.  Plaintiffs have accused no pagers in this case, only cellular telephones, and yet they seek to assert claims 16-23, which specifically require pagers, against cellular telephones.  In short, Plaintiffs seek to read the paging terms to include every wireless communication device capable of alphanumeric communication, rather than as devices *only* capable of alphanumeric communication.  This is unsupported by the specification, the prosecution history, and extrinsic evidence.

---

[17] T-Mobile has revised its proposed constructions to address the fact that although the "flex" paging protocol was the standard paging protocol at the time the patent was written, and is the only paging protocol disclosed in the patent, other paging protocols also exist.

Each of claims 16-22 requires a "wireless communication device comprising a pager assembly" or an "alphanumeric pager."  Claim 23, which depends from claim 22, further requires that the "pager assembly comprise[es] an alphanumeric pager."  It is clear from the specification that pagers are not interchangeable with, but rather are a subset of, wireless communication devices, which run on distinct networks.  Indeed, the specification defines a "wireless communication device" to "include a pager, cellular telephone, personal digital assistant (PDA) or other applicable wireless communication device[]."  '923 patent at 2:30-32.  The specification also refers to paging and cellular infrastructure separately, as distinct types of networks.  *See, e.g.*, *id.* at 5:1-3 ("The over-the-air network can be defined by any compatible paging and/or cellular infrastructure"); 8:28-30 ("a search is made for a compatible over-the-air network 14, such as, but not limited to a cellular, or paging network infrastructure").

The prosecution history further demonstrates that the patentee and the PTO examiner understood a pager to be a specific sub-class of wireless communication device.  The examiner rejected a number of claims involving a wireless communication device as being anticipated by Forslow (Exh. 2), but he did not reject claims requiring a "pager assembly," because Forslow disclosed only a cellular telephone.  Exh. 1 at CALYPSO00071-73.  Instead, the examiner initially rejected the pager claims as obvious in view of Kolls (Exh. 3), which disclosed a pager assembly, combined with Forslow.  *Id.*  The patentee did not challenge the examiner's interpretation of these references.  *Id.* at CALYPSO00091-92.

Extrinsic evidence also confirms that pagers are limited to alphanumeric messages, among other distinctions.  *See, e.g.*, Exh. 11 at 439 (Walke, *Mobile Radio Networks: Networking and Protocols* (Wiley 1999) ("Paging systems . . . allow unidirectional transmission of information in the form of a tone or a numeric or alphanumeric message to the person being contacted, whose location area is not known.")); Exh. 12 at 156 (Tanenbaum, *Computer*

*Networks* (Prentice Hall 1996) ("We will later see how this [pager] mode contrasts with mobile telephones, which are two way and use two frequencies per call, with different frequency pairs used for different calls")).

Finally, Plaintiffs' attempt to equate pagers with the generic category "wireless communication device" runs afoul of claim differentiation. Using different terms in different claims, as here, suggests that the terms and claims have a different meaning and different scope. *See, e.g.*, *Symantec Corp. v. Computer Assocs. Int'l*, 522 F.3d 1279, 1289 (Fed. Cir. 2008) (stating that "when construing terms in the body of a claim, the general assumption is that different terms have different meanings."); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F. 3d 1182, 1187 (Fed. Cir. 1998) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims.") (internal citation omitted). Plaintiffs' improper construction of the pager limitation to include every wireless communication device capable of alphanumeric communication would render Claims 1 and 16 identical, among other redundancies, and thus should be rejected.

### 9. "Messaging Communication" (Claims 6-9, 11-15)

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
|---|---|
| Data communication | Alphanumeric messaging communication |

At issue here is the Plaintiffs' attempt to stretch the term "messaging communication" to include essentially all types of wireless communication, including voice and video. In contrast, T-Mobile seeks to construe "messaging communication" in accordance with the plain language of the limitation, the claims, and the specification.

The specification consistently describes and refers to "messaging communication" as "alphanumeric messaging," and as a subcategory of "data communication," which also includes voice and video. For example, the invention is described as being "directed to a system and method of hybrid communication which provides data communication including, but not limited

to, voice, video and/or alphanumeric messaging." '923 patent at 2:21-23. The specification also describes the "messaging communication" as using standard "flex protocol," which is a paging protocol, and limited to alphanumeric messages. *See, e.g.*, *id.* at 1:61-63 ("such improved technology could include a hybrid communication system which will operate using standard flex paging protocol in combination with Bluetooth or similar technology for *short range messaging*. Such an improved hybrid communication system should have the ability to automatically switch to *messaging communication* with the wireless communication device").

The claims themselves also use "messaging communication" in a manner that only makes sense if the "messaging communication" refers to alphanumeric messaging and not other types of "data communication." Claims 12 and 13, which depend from claim 11, recite "establishing at least two-way messaging with the wireless communication device," and "establishing at least one-way messaging with said wireless communication device," respectively. Voice communication, which Plaintiffs attempt to include in "messaging communication," requires two-way communication because it requires two people speaking to each other at the same time. As a result, it cannot be encompassed within the concept of "one-way messaging." Indeed, one-way messaging is associated with pagers, which are frequently one-way devices capable of receiving but not sending messages. *See, e.g.*, Ex. 11 at 439.

Plaintiffs' definition also violates the doctrine of claim differentiation because it would render many of the dependent claims superfluous, *e.g.*, claim 12 and 13, described above, and claims 21 and 22, which require "at least one-way messaging" and "at least two-way messaging," respectively. As the Federal Circuit has held, "different claim terms are presumed to have different meanings." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006). Especially where, as Plaintiffs recognize, the different terms are used in the same claims, as in Claims 6 and 11, the presumption of different meanings is particularly

strong. *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim term lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention.") (internal quotations omitted).

To support their erroneous construction, Plaintiffs cite a list of instances in the specification, without context, where the terms "messaging communication" and "data communication" are used to describe elements of the claimed invention.  D.I. 201 at 22-23. These passages do not support the Plaintiffs' position but rather emphasize that the patentee understood "messaging communication" to be a subset of "data communication."

### 10.    "Over-The-Air Network" (All Asserted Claims)

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
| --- | --- |
| Paging and/or cellular infrastructure, satellite communication or other applicable communication network | Cellular, paging, satellite, and/or other applicable wireless communication network[18] |

There is no disagreement on this term, except that Plaintiffs' proposed construction adds the phrase "or other applicable communication network" without specifying what type of "other" network is involved.  T-Mobile seeks to clarify that the "other applicable" network is a wireless "communication network," just as "cellular, paging, and satellite" networks are wireless communication networks.

The '923 patent purports to claim a system and method that allows data communication to switch between a computerized network and an over-the-air network.  A crucial aspect of understanding the claims is the distinction between these types of networks.  Specifically, the

---

[18] T-Mobile has revised its construction to address the concerns raised by Plaintiffs regarding potential limitations that the use of "or" versus "and/or" would have on the terms.  D.I. 201 at 8-9.  Although T-Mobile disagrees that such a limitation was present in its original construction, T-Mobile has replaced "or" with "and/or" to avoid any confusion.  T-Mobile has also added "wireless" to further clarify the term for the jury, as explained in this section.

jury will need to understand that, according to the patent, a computerized network refers to a short-range, localized network, like a Wi-Fi network, while the over-the-air network describes a wireless network, such as cellular, paging or satellite network. About this, the parties are in agreement. *See* D.I. 201 at 2-3. Indeed, there is no dispute about the meaning or scope of the term in substance.[19] Therefore, the proper construction is that provided by T-Mobile and Plaintiffs should agree to it.

### 11.     "Unique Identifier" (Claims 1, 6-9, 16-23, 24-25, 27)

| Plaintiffs' Proposed Construction | T-Mobile's Proposed Construction |
|---|---|
| No construction necessary - plain meaning; alternatively, a unique identifier or code associated with the wireless communication device | A unique identifier or code of the wireless communication device |

The '923 patent discloses the use of a "unique identifier" that serves to identify and authenticate the wireless communication device to other components of the system and, in particular, the transceiver of a Wi-Fi access point. T-Mobile's proposed construction makes clear that the "unique identifier" is used to identify the wireless communication device to other components of the system, and not vice versa. Although Plaintiffs concede in their brief that the identifier must pertain to the wireless communication device, their use of the amorphous phrase "associated with" would allow their construction to encompass identifiers pertaining to other components in the system. Such a broad construction has no support in the specification.

The plain meaning of the phrase "unique identifier" suggests that it is specific to a given device (unique) and that it is used to identify that device. Further, the claims make clear that the "unique identifier" is the identifier of the wireless device and not some other component of the system. *See* Claims 1, 6, 16, 27 (requiring a "wireless communication device including a unique

---

[19] Plaintiffs incorrectly argue that under T-Mobile's proposed construction, paging could not occur over a cellular network. D.I. 201 at 9. This is not true. T-Mobile is in agreement with Plaintiffs that it can.

identifier" (or a plurality of such devices)).  The specification also clearly spells out the purpose of the unique identifier:  "The unique identifiers associated with each of the plurality of wireless communication devices are unique unto themselves and serve as an identifying code to any one of the appropriately programmed or configured first transceivers associated with different ones of the plurality of computers."  '923 patent at 2:65-3:3; *see also* 2:44-52 ("each of the plurality of wireless communication devices include a unique identifier or code capable of being recognized by another compatible transceiver"); 6:34-42 ("Each of the wireless communication devices 10 may also include a unique identifier or 'code' to facilitate recognition between the first and second transceiver chips 19 and 21).  The "unique identifier" is never associated with any component of the system other than the wireless communication device.

Plaintiffs concede that the "unique identifier" attaches to the wireless device, and not any other component of the system, but contend that T-Mobile's construction "would unnecessarily limit the unique identifier to being embodied within the wireless communication device itself." D.I. 201 at 10.  Plaintiffs argue that the "unique identifier" limitation may be satisfied by "a password or personal identification number ('PIN') being input by the device user in response to an authentication prompt."  D.I. 201 at 11.  T-Mobile's construction does not in any way exclude such an interpretation.  Plaintiffs' overbroad construction, particularly the phrase "associated with," by contrast, could reach beyond the wireless communication device to encompass other components of the system, for example, the computer facility.  Because "reliance on a term's ordinary meaning does not resolve the parties' dispute," the court should construe this term in accordance with T-Mobile's proposal.  *See O2 Micro*, 521 F.3d at 1361.

## CONCLUSION

T-Mobile respectfully requests that the Court construe the disputed terms of the patent in accordance with T-Mobile's proposed constructions.

Dated:  August 21, 2012               Respectfully submitted,

                                    /s/Josh A. Krevitt

                                Josh A. Krevitt, N.Y. Bar 2568228
Lead Attorney
Benjamin Hershkowitz, N.Y. Bar No. 2600559
Anne Champion, N.Y. Bar No. 4425237
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
jkrevitt@gibsondunn.com
bhershkowitz@gibsondunn.com
achampion@gibsondunn.com

*Attorneys for Defendant T-Mobile USA, Inc.*


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service on August 21, 2012

                                  /s/   *Josh A. Krevitt*