**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| CALYPSO WIRELESS, INC., DRAGO DAIC, & JIMMY WILLIAMSON, P.C., <br><br>      Plaintiffs-Counterclaim Defendants, <br><br>  v. <br><br>T-MOBILE USA, INC., <br><br>      Defendant-Counterclaim Plaintiff. | Case No. 2:08-CV-441-TJW-CE <br><br> Jury Trial Demanded |

**DEFENDANT T-MOBILE USA, INC.'S SUR-REPLY IN SUPPORT OF
T-MOBILE'S CLAIM CONSTRUCTION BRIEF TO ADDRESS THE
DEPOSITION TESTIMONY OF PLAINTIFFS' CLAIM CONSTRUCTION
EXPERT AHMED TEWFIK**

## TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ...............................................................................................1

II. ARGUMENT ......................................................................................................1

    A.    Dr. Tewfik Substitutes an Ideal Invention for the Current Invention ................................................................................................1

        1.    The Patent Does Not Disclose a Vicinity Range Defined By Power Level, Signal Strength, or Any Criteria Other Than Distance ............................................................2

        2.    Dr. Tewfik's Interpretation of "Pre-Established Vicinity Range" Would Eliminate the Limitation Specifically Added to Overcome Rejection by the Patent Office ......................4

        3.    Dr. Tewfik Has No Support for His Extreme Interpretations of "Pager Assembly" and "Messaging" ...................5

    B.    Dr. Tewfik Argues Against Hypothetical Interpretations of Claim Terms Not Proposed by T-Mobile ......................................................8

        1.    The '923 Patent Allows for User Input to Configure the Computer or User Account, Not Automatically Establish or Switch Network Connections .......................................8

        2.    T-Mobile Does Not Propose Construing "Continuously Searching" as Scanning Indefinitely ...............................................8

    C.    Dr. Tewfik Agrees With T-Mobile's Constructions of Several Terms ......................................................................................................9

III. CONCLUSION ...................................................................................................9

## I. INTRODUCTION

At his deposition, Dr. Tewfik proposed interpretations of some of the disputed claim terms that contradict the intrinsic record, extrinsic sources from the time the patent was filed, and indeed many of Plaintiffs' proposed constructions. Dr. Tewfik substitutes an ideal invention that includes every technical factor that should be considered, and that can operate using today's technology, for the purported invention actually disclosed and claimed in the patent-in-suit. The citations to the specification identified by Dr. Tewfik in his declaration and deposition could be described—at best—as vague or ambiguous, and generally do not support his interpretations. To support his interpretations, he relies entirely on his own experience as an engineer and his memory of the state of the art at the time. Dr. Tewfik has identified no other extrinsic sources to support his opinions, and has testified that he did not consult any extrinsic sources in preparing his opinions. Ex. 1 (Deposition of Dr. Tewfik ("Tewfik Dep.") at 12:1-17.

## II. ARGUMENT

### A. Dr. Tewfik Substitutes an Ideal Invention for the Current Invention

Dr. Tewfik's interpretation of the claim terms "pre-established vicinity range," "wireless communication device comprising a pager assembly," "alphanumeric pager," and "messaging communication" sets aside their use in the patent and takes off into flights of fancy describing the perfect system to provide automatic switching between networks and a clairvoyant patentee who foresaw the rise of tablets, but did not think to include "laptop" in the definition of wireless communication devices. This can be explained in part by Dr. Tewfik's deficient understanding of the law governing claim construction, including specifically the importance of the intrinsic record and the disclosures made by the patentee therein, and Dr. Tewfik's lack of familiarity with the intrinsic record. Dr. Tewfik admitted that he had not read all of the prior art cited during prosecution of the '923 patent; had not read the patent that was filed as a continuation-in-

part, or its prosecution history or references cited therein; and had not read the patentee's PCT application, prosecution history or patents cited therein. Ex. 1 at 14:15-15:8; 15:14-16:20, 179:10-180:3. As a result, the Court should give Dr. Tewfik's interpretations of these claim terms no weight when construing the terms.

### 1. The Patent Does Not Disclose a Vicinity Range Defined By Power Level, Signal Strength, or Any Criteria Other Than Distance

As explained in T-Mobile's brief, the '923 patent repeatedly refers to the pre-established vicinity range in terms of distance. Defendant T-Mobile USA, Inc.'s Responsive Claim Construction Brief ("D.I. 213") at 6-8. In fact, the criteria identified by Dr. Tewfik was disclosed in the prior art before the examiner during prosecution, and the patent was allowed only after patentees amended the claims to add the pre-established vicinity range limitation to every independent claim. D.I. 213 at 8-10; D.I. 214-1; 214-2 at 5:1-10, 33-51; 214-3 at Abstract, 49:42-50; 214-4; 214-5 at Abstract, 3:14-29; 214-6 at 2:47-57; 214-7 at 8:5-17. Plaintiffs, through their proposed construction of "pre-established vicinity range" and through Dr. Tewfik's even broader interpretation of the term, impermissibly attempt to write that limitation out of the claims and broadening the scope of the claims. *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (stating that courts should not "construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the [Patent Office].").

Dr. Tewfik ignores the intrinsic record and substitutes his own understanding of how a pre-established vicinity range should work in an ideal system and his own knowledge for that demonstrated by the patentee in the intrinsic record. Specifically, Dr. Tewfik defines the pre-established vicinity range as any zone in which the transceivers would be able to communicate

with each other.[1] Ex. 1 at 33:7-12, 105:10-12. Dr. Tewfik argues in support of his interpretation that the pre-established vicinity range must be defined by a variety of parameters related to the propagation of radio signals, including signal strength, signal-to-noise ratio, and power level. Ex. 1 at 79:16-21, 93:25-94:8; *see also* D.I. 201-6 (Tewfik Decl.) ¶ 15. According to Dr. Tewfik, the patentee indicated that these factors would be involved in the determination of the pre-established vicinity range because he stated that the pre-established vicinity range could vary based at least in part on technological advancements and the specific applications of the present invention. Ex. 1 at 85:14-86:3. Dr. Tewfik also relied on references by the patentee that in an embodiment where Bluetooth technology is integrated, the transceiver assembly is preferably capable of transmitting through solid, non-metal objects, and that the range (as described in the patent in terms of meters) is typically extended by increasing the transmitting power. Ex. 1 at 101:5-15.

    Dr. Tewfik may be correct that a system administrator would take these propagation effects, including assumptions about where the system will be used (in a house, business, outdoor area), what environmental factors may be present in such a location, and the power levels the computer will be able to achieve, into account in determining what pre-established vicinity range should be programmed into the system for each communication protocol (although T-Mobile takes no position here regarding whether this is enabled by the '923 patent or whether this is disclosed in the prior art). That does not mean, however, that the pre-established vicinity range is defined within the system in terms of these propagation effects or other factors. As

---

[1] Indeed, Dr. Tewfik even finds Plaintiffs' proposed construction too limiting because an ideal vicinity range would be a zone only partially defined by the preset power level. Ex. 1 at 107:12-22.

noted above, the patent is clear that the pre-established vicinity range is defined within the system in terms of a maximum distance from the computer providing the computerized network.

In fact, Dr. Tewfik cannot help but acknowledge the role that distance plays in the invention. Dr. Tewfik described the patent as being generally about the ability to communicate to the wired internet through fixed devices when you (with a wireless communication device) *"are close to"* those devices, and if you (with a wireless communication device) *"are away from one of these devices,"* the wireless communication device must communicate over the over-the-air network. Ex. 1 at 33:23-34:14, 35:2-21. Dr. Tewfik also described "pre-established" as the "upper-bound" on "how far you could be from that access point" depending on the particular communication technology in use. Ex. 1 at 92:3-10.

### 2. Dr. Tewfik's Interpretation of "Pre-Established Vicinity Range" Would Eliminate the Limitation Specifically Added to Overcome Rejection by the Patent Office

Dr. Tewfik's interpretation would effectively eliminate the limitation of the "pre-established vicinity range" because if the pre-established vicinity range is defined only by the ability of the devices to communicate with each other, then the range itself would have no meaning and would not be a limitation. In fact, because the patent defines the ability of the devices to communicate with each other in part by whether they are within the pre-established vicinity range, defining the range in terms of whether the devices are able to communicate with each other renders the limitation entirely circular and provides no meaningful limitation. Ex. 1 at 93:25-94:8.

The factors proposed by Dr. Tewfik as determining whether the devices can communicate with each other, and thus, determine pre-established vicinity range, also eviscerate the meaning of the limitation because they cannot be "pre-established"—which Dr. Tewfik admits. Ex. 1 at 90:19-92:10. A vicinity range as defined by Dr. Tewfik cannot be pre-

established because it will naturally vary based on signal strength and various propagation effects, including whether the network were deployed indoors or outdoors, potential interference and other environmental factors. Ex. 1 at 30:17-31:20; 45:5-19; *see also* D.I. 201-6 (Tewfik Decl. ¶ 15). Instead, Dr. Tewfik interprets "pre-established" to mean the general bounds of the network based on the type of technology, such as Bluetooth, Wi-Fi or other types of communication networks. Ex. 1 at 89:10-90:15, 90:19-92:10. This completely contradicts the intrinsic record and should be rejected in construing the claim term "pre-established vicinity."

### 3. Dr. Tewfik Has No Support for His Extreme Interpretations of "Pager Assembly" and "Messaging"

According to Dr. Tewfik, a "pager" could be any device that has the capability to do data communication, including a PDA, laptop or tablet.[2] Ex. 1 at 52:5-53:8, 57:15-22, 58:9-13, 140:24-141:7, 168:4-11. Dr. Tewfik's interpretation of pagers is premised on his opinion that a PHOSITA in 2000 would have known that pager technology was evolving and being replaced by other technology, and that the inventor meant pagers as a stand-in for all technologies that send and receive data. Ex. 1 at 28:12-29:10, 52:5-53:8, 53:23-54:2, 54:4-25, 143:3-17. This interpretation is flawed for at least three reasons.

First, Dr. Tewfik's interpretation contradicts the descriptions of pagers and paging networks in the patent. The patent repeatedly refers to and reflects the patentee's understanding that paging networks and cellular networks are separate networks. *See, e.g.*, D.I. 201-1 ('923 patent at 2:28, 3:34, Figures 1 and 2); *see also* D.I. 213 at 24-26. Cellular networks were able to carry text messages in 2000. Ex. 1 at 188:13-19. Thus, if paging network were simply a stand-in for data networks, there would be no reason to identify them separately. Similarly, the patent repeated refers to pagers as separate devices from phones or PDAs. *See, e.g.*, 201-1 ('923 patent

---

[2] Dr. Tewfik offered this opinion for the first time during his deposition.

at 29-21, 4:59-61). Both cell phones and PDAs received data in 2000. If pagers were simply devices that sent and received textual data (or any other type of data) it would be unnecessary to identify them separately. Laptops had also been configured for communication with cellular or satellite networks ("over-the-air" networks) as well as short-range networks in 2000, but were never disclosed in the patent. *See, e.g.*, D.I. 226 (T-Mobile technology tutorial, Sections 24-27).

Second, the claims that recite a pager assembly contain no additional scope of protection than the claims that recite just a wireless communication device, other than that they are directed to a pager assembly. *Compare* claims 1 and 16. The patent defines, and the claims recite, a wireless communication device as a device that is capable of conducting data communication. *Id.* There would be no need for the patentee to specifically claim a device comprising a pager assembly if that device were interpreted to have the same scope as a wireless communication device. In fact, if a wireless communication device comprising a pager assembly is construed to mean a cell phone that can send and receive text messages, than a wireless communication device with no modifier would have to be construed to mean a cell phone that does not send or receive text messages.

Third, pagers are not a dead technology. Pagers are still commonly used today for certain purposes because they utilize a separate technology from cell phone or other data communication devices and have benefits over other types of communication; they are not simply cell phones that receive text messages. Pagers are devices that operate using specific paging protocols, like the flex paging protocol disclosed in the patent, over paging networks. *See, e.g.*, '923 patent at 1:59-65; Ex. 1 at 39:23-40:7; *see also* D.I. 226 (T-Mobile technology tutorial, Section 21); D.I. 214-11 at TMUS-PRIOR-ART00004281-82; *see also* D.I. 214-12 at 155-56. Paging protocols and paging networks differ from cellular networks in technically meaningful way. Ex. 1 at 46:5-23; D.I. 214-11 at TMUS-PRIOR-ART00004281-82. Pagers have benefits over other types of

communication that contributes to their continued use today, including that they use less bandwidth, less energy and are less likely to experience delays from network traffic. D.I. 214-11 at TMUS-PRIOR-ART00004281-82; D.I. 214-12 at 155-56. Pagers were still common in 2000; in fact, Calypso marketed a pager in 2004 that purported to have the same functionality of the patent, further supporting the interpretation of the term "pager assembly" in the patent as referring to a pager, or a device utilizing paging protocols. *See* D.I. 226 (T-Mobile technology tutorial, Section 42).

     Taking a similarly extreme position, Dr. Tewfik opined at his deposition for the first time that "alphanumeric messaging" should be interpreted to mean all digital communication, including voice conversations and video transmissions because digital transmissions are 1s and 0s, which are numerals. Ex. 1 at 196:8-197:15. The patent clearly does not contemplate this interpretation because it uses different words to describe messaging communication and data communication, and pagers from PDAs and cell phones. *See* D.I. 213 at 26-28. Dr. Tewfik discounts the presumption that the patentee's use of different words gives them different meanings and instead just states that they should be interpreted as the same. Ex. 1 at 196:8-197:15, 198:2-15. Dr. Tewfik identified no treatises or textbooks in support of his interpretations, and treatises and textbooks from the time explicitly contradict him. *See, e.g.*, D.I. 214-11 at TMUS-PRIOR-ART00004281, TMUS-PRIOR-ART00004283, TMUS-PRIOR-ART00004285; D.I. 214-12 at 155-56. And, despite this aggressive interpretation at the end of his deposition, Dr. Tewfik used the word "alphanumeric" throughout his deposition to mean merely a text communication of letters and numbers. *See, e.g.*, Ex. 1 at 47:1-15, 53:6, 53:13, 53:21, 53:23, 54:1, 54:24, 56:3.

> B. **Dr. Tewfik Argues Against Hypothetical Interpretations of Claim Terms Not Proposed by T-Mobile**
>
>> 1. **The '923 Patent Allows for User Input to Configure the Computer or User Account, Not Automatically Establish or Switch Network Connections**

The parties and Dr. Tewfik agree that the patent does not preclude the possibility that the user could "pre-configure the computer" or configure user's account to regulate data communication with a particular wireless communication device. *See* D.I. 201-1 ('923 patent 8:45-62); Ex. 1 at 73:11-18, 75:1-5. When the claims recite that communication is switched between networks ***automatically***, however, those steps or actions are performed without user input. *See, e.g.*, D.I. 201-1 ('923 patent at claims 4, 11, and 19-21). Plaintiffs and Dr. Tewfik attempt to stretch the patent's disclosure of user configuration of the system to mean that even those actions described as "automatically" occurring could also involve user input. Ex. 1 at 73:11-18. The patent does not support such a reading and the plain meaning of the word "automatically" flatly contradicts such an interpretation. *See* D.I. 213 at 16-17; Ex. 1 at 169:6-16.

Dr. Tewfik's analogies to a programmable thermostat highlight precisely this difference. *See* Ex. 1 at 73:19-74:4. Using Dr. Tewfik's analogy, the user can program the programmable thermostat to maintain a particular temperature, and the thermostat will turn on the heat based on sensor readings and its own internal algorithms but without user input at that time. *See id.* at 75:21-76:2. Similarly, the auto-switching capability may be responding to user configuration, but at the time the auto-switching capability switches networks, that switching occurs without user input.

>> 2. **T-Mobile Does Not Propose Construing "Continuously Searching" as Scanning Indefinitely**

Dr. Tewfik agreed with the natural understanding of T-Mobile's proposed construction as recited in the patent: that the scanning capability continuously searches for a period of time, and

8

during that time the searching is continuous and uninterrupted. *See* Ex. 1 at 121:6-8, 127:18-20; D.I. 213 at 22-24. Instead of acknowledging that this is all that it is required by T-Mobile's proposed construction, Dr. Tewfik argued that T-Mobile's proposed construction cannot be correct because it would require that a wireless communication device to scan indefinitely and thus have no connection to cellular and paging networks. *Id*. at 124:24-125:10. Dr. Tewfik identified nothing in support of his interpretation.

**C.     Dr. Tewfik Agrees With T-Mobile's Constructions of Several Terms**

Dr. Tewfik agreed with several of T-Mobile's proposed constructions during his deposition.

- **"Auto-switching capability":** Dr. Tewfik interprets auto-switching capability as the capability to determine which network to route the communication and switching from one network to the other. Ex. 1 at 72:20-73:5.

- **"Dependent on certain predetermined parameters":** Dr. Tewfik repeatedly described the auto-switching capability disclosed in the patent as depending on certain rules (plural) and a number of parameters (plural). Ex. 1 at 72:6-19; 76:24-77:8.

- **"Over-the-air network":** Dr. Tewfik described the over-the-air network as a "long-range wireless communications" network, agreeing with T-Mobile's proposed construction of "over-the-air network" as a wireless network. Ex. 1 at 42:12-25.

- **"Scanning capability" / "scanner capability" / "conducting a scan":** Dr. Tewfik agreed that the "compatible devices or components" disclosed in the patent are the transceivers, as identified in T-Mobile's proposed construction. Ex. 1 at 116:5-20.

### III.     CONCLUSION

For the foregoing reasons, T-Mobile respectfully requests that the Court construe the disputed terms of the patent in accordance with T-Mobile's proposed constructions.

September 7, 2012                                                                Respectfully submitted,


                                                                                 */s/Anne Champion*
                                                                                 Josh A. Krevitt (lead attorney)
                                                                                 N.Y. Bar No. 2568228
                                                                                 Benjamin Hershkowitz
                                                                                 N.Y. Bar No. 2600559

9

Anne Champion
N.Y. Bar No. 4425237
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
jkrevitt@gibsondunn.com
bhershkowitz@gibsondunn.com
achampion@gibsondunn.com

Jennifer Parker Ainsworth
Texas Bar No. 00784720
**WILSON, ROBERTSON & CORNELIUS, P.C.**
909 ESE Loop 323, Suite 400
P.O. Box 7339 [75711]
Tyler, Texas 75701
Telephone No. (903) 509-5000
Facsimile No. (903) 509-5092
jainsworth@wilsonlawfirm.com

*Attorneys for Defendant T-Mobile USA, Inc.*

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who have consented to electronic service on September 7, 2012.

／s/Anne Champion